THIS DISPOSITION IS CITABLE
AS PRECEDENT OF THE T.T.A.B.

Mailed: August 7, 2003
Designated as a Citable Precedent: August 19, 2003

UNITED STATES PATENT AND TRADEMARK OFFICE
————————————

Trademark Trial and Appeal Board
————————————

In re Cell Therapeutics, Inc.
————————————

Serial Nos. 75/313,795 and 75/313,796
————————————

Joanne Ludovici-Lint of McDermott, Will & Emery, for Cell Therapeutics, Inc.

Ronald McMorrow, Trademark Examining Attorney, Law Office 105 (Thomas G. Howell, Managing Attorney).
————————————

Before Simms, Hanak and Quinn, Administrative Trademark Judges.

Opinion by Hanak, Administrative Trademark Judge:

Cell Therapeutics, Inc. (applicant) seeks to register on the Supplemental Register CELL THERAPEUTICS, INC. in typed drawing form for "pharmaceutical preparations, namely, bio-chemical signaling pathway modulators of non-living nature, for use in all fields of medicine, medical research and pharmacology" (Ser. No. 75/313,795) and for "laboratory research and development services in the field of biomedical and therapeutic products that affect cellular

signaling pathways" (Ser. No. 75/313,796). Both intent-to-use applications were filed on June 24, 1997. In each of the applications, applicant disclaimed the exclusive right to use INC.

The Examining Attorney has refused registration in each of the applications on the basis that applicant's mark CELL THERAPEUTICS, INC. is a generic term for applicant's goods and services.

When the refusals to register were made final, applicant appealed to this Board. Applicant and the Examining Attorney filed briefs. Applicant did not request a hearing. Because the two applications involve common questions of law and fact, they will be decided in this one decision.

At the outset, our determination will focus upon whether the phrase CELL THERAPEUTICS is a generic term for applicant's goods and services. In this regard, we note that applicant has never argued that the addition of INC. would cause its mark in its entirety (CELL THERAPEUTICS, INC.) to be not generic assuming that it were proven that CELL THERAPEUTICS was generic for applicant's goods and services. See applicant's briefs pages 15 and 16. See also In re Packaging Specialists, Inc., 221 USPQ 917, 919 (TTAB 1984) ("The element INC. [is] recognized, in

trademark evaluation, to have no source identifying or distinguishing capability."); In re Paint Products Co., 8 USPQ2d 1863, 1866 (TTAB 1988).

Thus, the issue before this Board is whether the phrase CELL THERAPEUTICS is a generic phrase for applicant's goods and services. Because applicant is seeking to register a phrase and not a single or compound word, "the Board cannot simply cite [dictionary] definitions and generic uses of the constituent terms of the mark … in lieu of conducting an inquiry as to meaning of the disputed phrase as a whole to hold a mark, or a phrase within the mark, generic." In re American Fertility Society, 188 F.3d 1341, 51 USPQ2d 1832, 1836 (Fed. Cir. 1999).

In this case, unlike the situation in American Fertility Society, the Examining Attorney has made of record significant evidence showing that the entire phrase "cell therapeutics" is a generic phrase for applicant's goods (pharmaceutical preparations for use in all fields of medicine, medical research and pharmacology) and for applicant's services (laboratory research and development services in the field of therapeutic products that affect cellular pathways). Hence, we find that the PTO has

3

established that said phrase is generic as applied to applicant's goods and services.

To begin with, we note that the Examining Attorney has made of record from Webster's New Riverside University Dictionary (1994) definitions of the words "cell" and "therapeutics" which are, respectively, as follows: "Biology. The smallest structural unit of an organism that is capable of independent functioning." and "Medical. Treatment of disease." Thus, based upon these dictionary definitions and other evidence to be discussed below, a medical doctor or researcher (the purchaser or user of applicant's goods and services) would readily understand that the phrase "cell therapeutics" is a generic term for various goods and services that treat cells including pharmaceutical preparations for use in medicine, medical research and pharmacology, and for laboratory research in the field of therapeutic products that affect cellular signaling pathways.

However, as required by American Fertility Society, the Examining Attorney's evidence by no means stops with mere dictionary definitions of the individual terms "cell" and "therapeutics." Quite to the contrary, the Examining Attorney has made of record a plethora of articles from the NEXIS database as well as a lesser number of articles from

4

the Internet showing that the phrase "cell therapeutics" in its entirety is routinely used to name medical products and services that are designed to combat diseases of the cells.

Of the numerous stories making generic use of the phrase "cell therapeutic," the following are but a small sample. In the August 18, 1999 edition of Chemical Business there appears the following statement: "Osiris has developed proprietary technology to isolate and greatly expand adult stem cells for their use as cell therapeutic products for the regeneration of tissues damaged through injury, aging or degenerative disease." The January 7, 1998 edition of Business World contains the following sentence: "This firm has focused its research on five principal areas, namely: hypoxic cancer cell therapeutics, tumor amplified protein expression cancer therapy …" The September 9, 1999 edition of PR Newswire contains the following statement: "Doctor Sznol will oversee the company's chemical program for Promycin, an anticancer cell therapeutic that targets oxygen-depleted tumor cells …" The August 18, 1999 edition of Chemical Week contains the following sentences: "Cambrex has made a $5 million equity investment in cell therapeutics company Osiris Therapeutics (Baltimore) as part of a deal to develop new stem-cell products and culture media. Cambrex [has a] presence in

5

high-growth stem-cell research and [is in] a unique position in the production of future adult stem-cell therapeutic products." The Boston Herald of June 16, 1999 contains the following statement: "There has been a very favorable response moving forward with human embryo stem-cells in the development of cell therapeutics." The November 26, 1998 edition of Chemical Business contains the following sentence: "Imrx's majority owned subsidiary Nexell Therapeutics, Inc. is focused on cell therapeutics for cancer and other life threatening diseases."

As noted, these are but a few of the plethora of stories made of record by the Examining Attorney from the NEXIS database and, to a lesser extent, the Internet. In response to this massive body of evidence, applicant levels essentially two arguments. First, at page 8 of its briefs, applicant makes the following argument: "The excerpted articles submitted by the Examining Attorney largely comprise use of the wording 'CELL THERAPEUTICS' as broad references to a general field of study or research, not direct and unambiguous references to [applicant's] underlying research and development services." In essence, applicant is arguing that none of the numerous stories submitted by the Examining Attorney explicitly reference applicant's identification of goods and services which are,

6

as previously noted, "pharmaceutical preparations, namely, bio-chemical signaling pathway modulators of a non-living nature for use in all fields of medicine, medical research and pharmacology" and for "laboratory research and development services in the field of biomedical and therapeutic products that affect cellular signaling pathways." Applicant is technically correct. However, if we were to adopt applicant's test, then no word or term would be found to be generic provided that applicant submitted a highly detailed description of its goods and services. By way of analogy, the term "cancer therapeutics" is an extremely broad term that covers a wide array of goods and services that are designed to treat cancer. If an applicant were to seek registration of this generic term "cancer therapeutics" for "pharmaceutical preparations, namely, bio-chemical signaling pathway modulators of a non-living nature, for use in all fields of medicine, medical research and pharmacology," we seriously doubt that any Examining Attorney could find from the NEXIS database or the Internet a story that would use this clearly generic term in connection with precisely the identification of goods chosen by the applicant.

Second, applicant correctly notes that a substantial number of the stories selected by the Examining Attorney

7

from the NEXIS database are from wire services, and that in the past this Board has stated that such wire service news stories are of limited probative value. In this regard, applicant cites In re Professional Tennis Council, 1 USPQ2d 1917, 1918 n.5 (TTAB 1986) and In re Appetito Provisions Co., 3 USPQ2d 1553, 1555 n.6 (TTAB 1987). Two comments are in order. First, taking a narrow focus, both of these cases can be distinguished from the current case. In Professional Tennis Council the primary concern was that there was no evidence that the news releases appeared "in any newspaper or magazine circulated in this country." Professional Tennis Council, 1 USPQ2d at 1918 n.5 (emphasis added). While a few of the news releases in the present case have emanated from foreign sources, the vast majority have emanated from United States sources.

As for Appetito Provisions, the concern was that stories from "news services [are] not presumed to have been circulated among the general public [and hence their] probative value regarding attitudes among purchasers is limited." Appetito Provisions, 3 USPQ2d at 1555 n.6 (emphasis added). In Appetito Provisions the goods and services were Italian sausage and restaurant services. Obviously, such goods and services are truly directed to the general public who do not as a group have access to

news wire stories. In stark contrast, the relevant public in this case are highly sophisticated medical doctors and researchers who do have access to news wire stories. In this regard, it must always be remembered that in determining whether a word or phrase is generic, we are required to determine whether the word or phrase is generic to the purchasing public. Magic Wand Inc. v. RDD Inc., 940 F.2d 638, 19 USPQ2d 1551, 1552-53 (Fed. Cir. 1991) ("This court has stated that whether a term is entitled to trademark status turns on how the mark is understood by the purchasing public.") (emphasis added); In re Montrachet S.A., 878 F.2d 375, 11 USPQ 1393, 1394 (Fed. Cir. 1989) ("Whether a term is entitled to trademark status turns on how the mark is understood by the purchasing public.") (emphasis added).

Taking a broader view, we note that the Professional Tennis Council and Appetito Provisions cases were decided well over fifteen years ago. This Board would be blind if it did not recognize that during the past fifteen years, there has been a dramatic change in the way Americans receive their news. In the 1980's personal computers were in their infancy as was the transmission of news stories via the Internet. Put quite simply, we believe that communications have changed dramatically during the past

9

fifteen years such that by now it is by no means uncommon for even ordinary consumers (much less sophisticated doctors and researchers) to receive news not only via tangible newspapers and magazines, but also electronically through personal computers.  Thus, it is much more likely that newswire stories will reach the public because they can be picked up and "broadcast" on the Internet.  In short, while we are not saying that newswire stories are of the same probative value as are stories appearing in magazines and newspapers, we think that the situation has changed such that said newswire stories have decidedly more probative value than they did when this Board decided the Professional Tennis Council and Appetito Provisions cases.

One final comment is in order.  During the course of this proceeding, applicant made of record numerous third-party registrations for various goods and services where the marks included the word THERAPEUTICS.  At page 15 of its brief applicant "acknowledges that third-party registrations are generally not conclusive on the question of registerability and that each case must be considered on its own merits."  However, applicant then goes on to note that the "totality" of the registrations directly supports a finding that its mark is not generic for its goods or services. (Applicant's briefs page 16).

10

We simply disagree.  To begin with, many of the third-party registrations are for goods totally removed from applicant's goods and services.  Such third-party goods include "nail and cuticle oil" and "mattresses and cribs." In any event, it is a matter of law that "even if some prior registrations had some characteristics similar to [applicant's] application, the PTO's allowance of such prior registrations does not bind the Board or this court … The Board (and this court in its limited review) must assess each mark on the record of public perception submitted with the application.  Accordingly, this court finds little persuasive value in the registrations that [applicant] submitted to the examiner or the list of registered marks [applicant] attempted to submit to the Board."  In re Nett Designs Inc., 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001).

Decision:  The refusals to register are affirmed.